546 So.2d 693 (1989)
Charles SCHMIZ
v.
ILLINOIS CENTRAL GULF RAILROAD COMPANY and G.W. Powell.
No. 58517.
Supreme Court of Mississippi.
June 21, 1989.
Rehearing Denied August 9, 1989.
*694 William Liston, Alan D. Lancaster, Liston & Lancaster, Winona, John Hunter, Pascagoula, for appellant.
F. Hall Bailey, Wise, Carter, Child & Caraway, Leray McNamara, Forman, Perry, Watkins & Krutz, Jackson, for appellees.
Before DAN M. LEE, SULLIVAN and PITTMAN, JJ.
DAN M. LEE, Presiding Justice, for the Court:
Charles Schmiz (hereinafter Schmiz), on behalf of his deceased son, Robert Schmiz, brought a wrongful death action against the defendants, Illinois Central Gulf Railroad Company (hereinafter "ICG") and G.W. Powell pursuant to the Mississippi Wrongful Death Act (M.C.A. § 11-7-13). In this suit Schmiz sought damages for the death of his son which occurred on March 31, 1981, when the pickup which he was driving was struck by a freight train at the Ragsdale Road-Illinois Central Gulf Railroad crossing in Madison County, Mississippi. Schmiz charged that the death of his son was a result of the negligence of the defendants, ICG and its train engineer, G.W. Powell.
On November 8, 1984, this action was filed in the Circuit Court of Madison County, Mississippi. The case proceeded to trial by jury on March 18, 1987. After a fourday trial, the jury returned a verdict in favor of ICG and G.W. Powell. Following the entry of the judgment on the verdict, Schmiz timely filed his motion for j.n.o.v. and motion for new trial which were in due course denied by the trial court. Thereafter, Schmiz perfected this appeal and assigned two errors.
Finding merit in assignment I, we reverse and remand this case for a new trial. We do not find it necessary to address assignment of error II.

STATEMENT OF THE FACTS
Robert Schmiz (hereinafter Robert), 20-year-old native of Illinois, had only recently moved to Mississippi and was employed by Harvey-McGee Ford in Jackson, Mississippi. On the afternoon of March 31, 1981, Robert was sent to pick up auto parts from the Ford dealership in Canton, Mississippi. After finishing his appointed rounds in Canton, Robert asked directions from the Ford dealership, which was located on Highway 51 in Canton, to Interstate 55 South.
Apparently in an attempt to follow the directions which he had received, Robert drove south on Highway 51 out of Canton and turned west onto Ragsdale Road. As he travelled westerly along Ragsdale Road, there were no advance uniform traffic signs or pavement markings to warn him of the impending danger presented by the upcoming Ragsdale Road/ICG railroad grade crossing. Additionally, trees, shrubbery, bushes and other vegetation along the northern boundary of the roadway and the eastern boundary of the railroad right-of-way obstructed Robert's vision of the "railroad crossbuck" and the railroad grade crossing.
At the same moment that Robert's pickup was travelling in a westerly direction on Ragsdale Road toward the railroad crossing, an ICG train with a crew, consisting of Wayne Powell (engineer), Charles Holly (head brakeman), and Ronnie Crawford (fireman), was travelling south. As the train approached the Ragsdale Road crossing, Powell, the head engineer, testified that he began to blow the train's whistle in the traditional two longs, one short and one long sequence to give additional warnings to vehicles on Ragsdale Road. He also turned on the switch to operate the engine's bell.
Both Holly and Crawford noticed the pickup truck travelling west on Ragsdale Road approaching the crossing at a speed of approximately 40-45 miles per hour. Holly and Crawford testified that they never saw the truck slow down prior to collision. *695 Powell, on the other hand, saw the truck out of the corner of his eye when the train was only approximately 50 to 75 feet from the crossing. At that time, he activated the train's emergency braking system. Unfortunately, it was too late and the ICG train, which was travelling at approximately 45 miles per hour as it approached the crossing, hit the truck broadside, completely separating the bed from the cab of the truck. Robert died as a result of the injuries sustained in the accident.
Charles Schmiz, Robert's father, filed suit in the Circuit Court of Madison County, Mississippi. Trial was held on March 18, 1987, resulting in a jury verdict for ICG and G.W. Powell. Following the jury verdict, Schmiz filed a motion for a new trial. At a hearing on this motion, three jurors were called to testify concerning several jurors' unauthorized, as well as unsupervised, inspection of the railroad crossing. They were: Dennis Manshack, Kenneth Patterson, and Labonne Norman.
Dennis Manshack (hereinafter Manshack), who was elected foreman of the jury, testified that he detoured on his route home in order to view the crossing. In so doing, he stated that he, accompanied by Kenneth Patterson, a fellow juror, went over the crossing and back again and looked for the train, but they did not stop at or near the crossing. Manshack further testified that he advised the other jurors of his inspection and the impression he gained from that inspection, i.e., the crossing was in worse shape at the time of his inspection than it was at the time of the collision.
Unlike Manshack's testimony, Kenneth Patterson (hereinafter Patterson) testified that their inspection of the crossing occurred during a trial recess one afternoon, rather than on their way home. He further stated that they went to the crossing to "look around." In relating the facts surrounding their inspection of the crossing, Patterson testified that he and Manshack stopped about 50 feet from the crossing and looked to see how far they could see down the track. It was also Mr. Patterson's opinion, based on his inspection of the crossing, that there was more growth around the crossing at the time of his inspection than was shown in the photographs taken on the day of the collision.
To confirm Manshack's and Patterson's testimony, another juror Mrs. Labonne Norman (hereinafter Norman) was called to the witness stand. It was Norman's testimony that jurors Manshack and Patterson advised the other members of the jury that the crossing was grown up only on the county part and not on the railroad part of the right-of-way.
After having heard the testimony of Manshack, Patterson and Norman, the trial court denied Schmiz's motion for j.n.o.v. and motion for new trial. Schmiz perfected his appeal to this Court, assigning as error No. I the following:
I.
The Trial Court Erred in Denying Mr. Schmiz's Motion for New Trial in Light of the Prejudicial Misconduct of Several Members of the Jury in Conducting an Unauthorized Inspection of the Railroad Crossing.
Schmiz argues that it is an undisputed fact of this case that the jury was exposed to outside influences and incompetent evidence. In Crawley v. Illinois Central Railroad Co., 248 So.2d 774 (Miss. 1971), this Court faced a situation similar to the one in this case. In Crawley, as in the present facts, the plaintiff filed suit against the railroad alleging that the railroad was negligent in allowing its crossing to become dangerous due to the growth of weeds and underbrush. During a trial recess, two of the jurors, independently of each other and accompanied by their wives, travelled to the scene of the crossing for the purpose of determining the visibility at the crossing. Thereafter, the jury returned a verdict for the railroad and the plaintiff filed a motion for new trial based upon the unauthorized, unsupervised and improper inspection of the crossing by two members of the jury. This motion was overruled by the trial court.
*696 In reversing the trial court in Crawley, we stated:
It has been stated as a general rule that a private investigation of the case by members of the jury to discover evidence, or an unauthorized inspection of the scene involved, constitutes misconduct and where there is a reasonable probability that the verdict of the jury was influenced by the unauthorized view, the court should require a new trial.

Schmiz, following the general rule set out in Crawley, introduced the testimony of Manshack, Patterson and Norman. A review of these jurors' testimony uncovered the following facts:
1. At least two, and perhaps four, members of the jury panel conducted an inspection of the crossing during the course of the trial.
2. One of those jurors, Dennis Manshack, was elected foreman of the jury.
3. Manshack on the occasion of his inspection, which occurred during a late afternoon recess, was accompanied by Kenneth Patterson, a co-juror.
4. Manshack and Patterson went to the crossing for the specific purpose of inspecting the crossing.
5. Manshack testified that he and Patterson drove over the crossing and back again and looked for the train; but he denied stopping at or near the crossing.
6. Patterson, on the other hand, testified that he and Manshack stopped 50 feet east of the crossing (the side of the crossing involved in this case) and looked to see how far they could see down the railroad tracts.
7. Manshack advised the other jurors that, based upon his inspection of the crossing, the crossing was in worse shape at the time of his inspection than it was in at the time of the collision.
8. Patterson testified that, based upon his inspection of the crossing, there was more growth around the crossing on the occasion of his inspection than there was on the occasion of the collision.
9. Patterson also testified that at the time of his inspection he had no difficulty seeing or spotting the crossing.
10. Ms. Labonne Norman testified that Manshack and Patterson advised her and the other members of the jury that the crossing was grown up only on the county side and not on the railroad right-of-way.
There can be no doubt that the above testimony, when viewed in the light of our decision in Crawley, reveals that the inspection was for the purpose of obtaining additional evidence calculated to influence  and which probably did influence  the members of the jury. Equally clear is the fact that the inspection was not casual or by chance, but was made for the specific purpose of investigating the lack of visibility at the crossing, a material issue in dispute.
ICG contends that Mississippi Rule of Evidence 606(b) narrows and restricts this Court's holding in Crawley. We disagree and point out that M.R.E. 606(b) follows this Court's holding in Crawley as an exception to inquiry into jury verdicts.
M.R.E. 606(b) states:
(b) Inquiry into Validity of Verdict or Indictment. Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.

This rule was intended to prevent inquiry into the jurors' thoughts or deliberations in arriving at a verdict.
Although M.R.E. 606(b) was not in effect at the time that this Court rendered its *697 opinion in Crawley v. Illinois Central Railroad Co. (1971), the drafters of Rule 606(b) obviously followed the precedent set out in Crawley. We stated in Crawley, citing Sprinkle v. State, 137 Miss. 731, 102 So. 844 (1925), the following:
Therefore jurors will not be permitted on a motion for a new trial to give evidence as to what influenced their verdict. But testimony by jurors as to the misconduct of others in their presence or hearing  testimony as to outside influences brought to bear upon them  does not fall within that principle. They will not be heard to give evidence as to their own misconduct, but they will be heard to give evidence as to misconduct of others which is calculated to have a bearing on their verdict. (137 Miss. at 744, 102 So. at 846). (Emphasis added)
Expanding on our position taken in Sprinkle v. State, supra, the Crawley Court held:
There is no way to make such proof under the procedural rules of this state, unless this Court will extend the rule in Sprinkle v. State, 137 Miss. 731, 102 So. 844 (1925) to permit the testimony of jurors to show the influence upon the other jurors caused by an unlawful view by its members. We are of the firm opinion that the verdict of a jury should not be subject to impeachment by testimony of the jurors; nevertheless, where jurors disobey the orders of the court to the extent of visiting the scene involved in a case, when the scene is a material factor in issue, as in this case, for the purpose of obtaining additional evidence, such conduct of jurors must be considered to be improper. This was incompetent evidence thrown into the deliberations of the jury obtained by two jurors, probably innocently, though not lawfully.
Following the precedent in Crawley and the evidentiary rules set out in M.R.E. 606(b), this Court finds that it is permissible to question jurors as to any "extraneous prejudicial information [which] was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror."
At the hearing on Schmiz's motion for a new trial, Manshack, the foreman, as well as Patterson and Norman, fellow jurors, testified about the additional information relayed to the jurors from Manshack's and Patterson's investigation of the scene. Juror Norman testified as follows:
Q: How did you find out that they had gone to the crossing?
A: Well, they had just mentioned it casually while we were back in the court-room.
* * * * * *
Q: What did they say about it?
A: They said it was grown up only from the county side not really from the railroad side.
Q: Okay. Did they say anything else about it?
A: Not that I can remember. No.
Juror Manshack admitted that he went to the crossing and thereafter told the other jurors "in passing" his impression of the scene. Pertinent parts of Manshack's testimony are as follows:
Q: In this conversation, and, again, I am not going to ask you exactly what you said, but did you relate to the other jurors the impression, whatever the impression was, that you got from the crossing?
A: I mentioned that I thought it was in worse shape now than it was before.
* * * * * *
Q: Were these comments made during the jury deliberation, Mr. Manshack?
A: No, sir.
Q: When were they made.
A: Just when we were stuck in the room.

In light of these events, we feel constrained to follow the admonitions of Crawley, supra, where this Court cautions:
If the testimony divulges that the inspection was casual, or of such a nature as not to be calculated to influence the verdict of the jury, a new trial should not be granted. However, in the instant case the railroad was the predominant issue. *698 Where the inspection is of such a nature as to relate to a vital issue in dispute and calculated to influence members of the jury  and which probably did influence the jury verdict  a new trial should be granted.

Whether Schmiz's visibility was blocked by high foliage along the railroad right-of-way was a predominant issue in this case. For information to reach the jurors that the track area was in better condition at the time of the accident, March 1981, as compared to March 1987, the time of the improper inspection by two members of the jury, brings to the jury's attention evidence which was not subject to cross examination.
We additionally take note of the fact that Manshack and Patterson's impressions contradict the testimony of three witnesses. Alton Pearson, a resident of Ragsdale Road for many years testified that the scene of the accident was more extensively overgrown in 1981 than at the time of the trial. Another resident, John Cardner, supports Pearson's opinion by describing his inability to see over the high foliage around the track in March of 1981. Additionally, Mary Liberto, an insurance claims adjuster who investigated the collision, testified that in 1981 the bushes obscured a motorist's vision of the track; however, at the time of the trial, extensive clearing had been done in the area.

CONCLUSION
We find that the private investigation by members of the jury was improper and constituted misconduct. There is more than a reasonable probability that the verdict of this jury was influenced by the impressions the investigating jurors gained from their visit to the scene which were communicated to the jury. Therefore, we hold that the trial court abused its discretion and was in error in not granting Schmiz's motion for a new trial. Accordingly, the judgment of the Circuit Court of Madison County, Mississippi, dated March 25, 1987, is vacated and reversed, and this case is remanded for a new trial or other proper disposition not inconsistent with this opinion.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON, PITTMAN and BLASS, JJ., concur.